## McWILLIAMS v. EDMONSON.
### No. 11905.

Circuit Court of Appeals, Fifth Circuit.

June 23, 1947.

Rehearing Denied July 17, 1947.

W. H. Watkins, of Jackson, Miss., M. M. Roberts and T. C. Hannah, both of Hattiesburg, Miss., for appellant.

T. J. Wills and George W. Currie, both of Hattiesburg, Miss., for appellee.

---

Before HUTCHESON, WALLER, and LEE, Circuit Judges.

## HUTCHESON, Circuit Judge.

The matters for determination here had their rise in transfers of a large number of pieces of real and personal property, purportedly made on August 25, 1943, but recorded October 6, 1943, by F. T. Newton, a government contractor, and his wife to Mrs. Edmonson.

On November 4, 1943, the Maryland Casualty Company, surety on Newton's contractor's bond, filed suit against the Newtons, Mrs. Edmonson, and others to set these transfers aside as fraudulent, and, carrying in its wake the appointment of a receiver for the Newtons, a determination that the transfers constituted acts of bankruptcy on their part, and their adjudication as bankrupts,[1] the controversy has since continued.

On March 23, 1946, defendants, the Newtons and Edmonsons, filed an answer to the intervention. In it, denying, as they had done in the bankruptcy proceedings, that the conveyances were fraudulent or in anywise impeachable, they put forward the theory on which they in part prevailed below, that Mr. and Mrs. Edmonson were sub-partners with Newton as to three of his contracts which were profitable and that the transfers were made to them in satisfaction of their distributive share of the profits from these contracts.

The district judge found: that the Edmonsons were sub-partners in the three contracts named; that these contracts were profitable; that the Edmonsons' share of these profits was $104,000; that in taking the conveyances in satisfaction of their profit interest, they had no intention to defraud but acted in good faith; and that they were, therefore, bona fide purchasers; but that the properties transferred were worth $450,000, and the amount paid was less than their fair equitable value. Concluding from these findings that Mrs. Edmonson was a purchaser "who without actual fraudulent intent has given a consideration less than fair, as defined in Subd (d)[2] for such transfers", that "she may retain the property * * * as security for repayment", he gave judgment accordingly. This appeal is from that decree.

Appellant is here with briefs and oral arguments surcharged with the feeling and the accusation that the whole sub-partnership theory on which the case went off below was conceived in sin, born in iniquity and "rocked in the cradle of chicanery, subterfuge and fraud". He insists that the gaze of the district judge was so foreshortened by his preoccupation with the legal niceties of the sub-partnership theory that he could not or would not see the case in its true perspective. He urges upon us that (a) there was no proof of a valid sub-partnership here, (b) if there was, nothing was due the Edmonsons under it, and (c) the case is one simply of a common fraud and should be so decided. Appellee, putting her whole reliance, as indeed she must, on the sub-partnership theory, devotes the major portion of her brief to a discussion of sub-partnerships in general and her sub-partnerships in particular.

A reading of the briefs and a consideration of the case made by the record makes it quite plain that here, as was the case in Guy v. Donald, 203 U.S. 399, 27 S.Ct. 63, 64, 51 L.Ed. 245, the questions for decision "go beyond the question of the existence of a partnership". Briefs and record make it quite clear, too, that this is a case, as that one was, where "As long as the matter to be considered is debated in artificial terms there is danger of being led by technical definition to apply a certain name, and then to deduce consequences which have no relation to the grounds on which the name was applied". Id., 203 U.S. at page 406, 27 S.Ct. at page 64. As the court did there, we shall, in order to arrive at a right decision, declining to debate "in artificial terms the matter to be considered", decide the case by setting out its substance.

On August 14, 1943, Newton, a contractor, with uncompleted government contracts totaling very large sums, all of them financed through, and assigned to, the Union Planters National Bank and Trust

---

[1] Newton v. Glenn, 5 Cir., 149 F.2d 879.

[2] Sec. 107, sub. d, 11 U.S.C.A.

Company of Memphis, Tennessee, owed the bank on account of them approximately $1,500,000. On that date Newton made two deeds, each covering the same, and Mrs. Newton made one deed covering other, property, to Mrs. Edmonson, Mrs. Newton's sister. These deeds for a recited consideration of $10 and other good and valuable consideration, conveyed to her all the property they owned in Mississippi, except their homestead, property which the Newtons in their business statements had valued at $451,000, and thus stripped the Newtons and their business of every asset which when they made their banking arrangements they had held themselves out as having.

So gross was this act of nepotism, so conclusive of a fraudulent purpose on the part of the Newtons to delay, hinder and defeat their creditors, that the district judge in the bankruptcy proceedings found as matter of law and in these proceedings as matter of fact that the conveyances were in fraud of Newtons' creditors. When it came, however, to setting them aside as to Mrs. Edmonson, he declined to do so because, though he found that the properties were worth greatly in excess of the $104,000 they claimed as due and they were entitled only to hold them as security until that amount was paid them, he found also that they had sustained their burden of showing that in respect of the transfers they were bona fide purchasers without knowledge of Newton's insolvency and without an intent to defraud. In so holding the district court made findings of fact whirch are clearly erroneous and must be set aside.

If we could agree with him that the so-called sub-partnership agreements were effective to give the Edmonsons an enforceable interest in the profits from the government contracts they dealt with, we still could not agree with his conclusion that, in this controversy between the creditors of Newton and his wife on one side and his wife's sister on the other, appellee had sustained the burden of showing that there were profits to which she was entitled. Finally, if we could agree with the district judge that she had sustained her burden of showing that there were profits

from those contracts to which she was entitled as between her and Newton, we could not agree that in joining with the Newtons to strip them of their property she acted in good faith and without intent to defraud their creditors.

The three contracts on which Mrs. Edmonson relies as giving her an interest in Newton's ventures are identical in their terms. One deals with the Camp Campbell, one with the Greenville, one the Rohwer contract. Reciting that Newton and Glenn are engaged in the general contracting business, Newton owning two-thirds, and Glenn one-third, that they have entered into a new contract and "it is necessary for the said Newton to acquire additional capital for the construction of said work in order to take the same", each then provides as to the seven persons named, including Newton and Mrs. Edmonson, that each of said parties is to share "for the capital invested equally in the two-thirds interest of Newton, that is to say, each of said parties is to contribute one-seventh of the losses of the two-thirds interest and is to share one-seventh of the profits," not of the general contracting business but of the particular contract named. Each gives Newton full power to conduct the construction and carry out the contract, and to act with reference to it as if he were the sole owner of it. Each declares that the six parties named are the silent partners of Newton, and that all of the work is to be carried out in the name of Newton and Glenn, all records and accounts shall be kept in the firm name of Newton and Glenn, and that Newton is authorized to bind all of the parties by any act that he may do. The evidence is undisputed that the Edmonsons furnished no capital and no services, and that Newton assigned the three contracts, in which Mrs. Edmonson claimed an interest, together with others, to the bank to secure any and all of his obligations to it, and that the whole proceeds of the contracts were paid to the bank.

██ Matters standing thus, we think it perfectly clear that the instruments relied on did not constitute binding obligations on the part of Newton to pay the Edmonsons anything, first, because by express

provisions they were to share in consideration of the capital advanced, and they advanced no capital, second, because wholly without consideration and merely promises to make gifts, the Edmonsons did not and could not have any title to or interest in the profits until they were realized and actually paid over to them. Under this agreement, Newton was to manage the business as though it were his own, and with their full authority, he assigned the contracts to the bank. In a contest with Newton's creditors, including the bank, over Newton's property, Mrs. Edmonson is without standing to claim that she was a creditor of Newton to the extent of her share of the profits from the contracts and therefore a bona fide purchaser.

■ Further, if mistaken in this and the contracts were valid and enforceable obligations upon Newton to pay the Edmonsons their share of the profits, we think it quite clear that the record, with its showing of inconsistent claims and actions on the part of the Edmonsons and the Newtons, and its general deficiencies, is wholly insufficient to support a definite finding that upon a proper accounting, profits were or would have been due the Edmonsons in the amount they claim.

■ Finally, the invoked section of the Bankruptcy Act, 11 U.S.C.A. § 107 sub. d has, and can have, no application to transactions and performances of the kind the record shows took place here. The statute deals with and protects substantial claims of persons who have dealt in fairness and good faith and who, because they have done so, are entitled to equitable protection. It has no application to nepotic and fictitious arrangements of this kind entered into by members of a debtor's family to defeat creditors while keeping the property safely in the family. Hastily put forward and as hastily pressed to a conclusion by Newton and his wife when, their troubles mounting, they were tottering to their fall, the record leaves in no doubt that the plan of conveying their properties to Mrs. Newton's sister was as ineffective as it was disingenuous, as futile as it was false and faithless to their creditors. The very fact that the Newtons placed in the protective custody of Mrs. Edmonson every piece of property that Newton owned at a time when, on the undisputed evidence, they knew that he was hard up for money and that his affairs were involved, completely refutes as matter of law the claim that the transfers were taken bona fide and that the transferees are entitled to protection. The statute has no such function. It cannot be given such operation. There was no basis in the evidence for the judgment. It is reversed and the cause is remanded with directions to set the transfers aside and to deny the Edmonson claim.